1

2

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    USA,                                    Case No. 19-cr-00115-CRB-1

9              Plaintiff,

10        v.                                 **FINDINGS RE SENTENCING**
                                             **GUIDELINES AND RESTITUTION**
11   PRITHVIRAJ R BHIKHA,

12             Defendant.

13        While working as a Senior Director at Cisco Systems Inc., Defendant Prithviraj

14   Bhikha accepted kickbacks from a third party company in exchange for facilitating Cisco's

15   business relationship with that company.  Bhikha also awarded Cisco business to overseas

16   companies that Bhikha secretly owned.  Bhikha's sentencing requires the Court to address

17   how the Federal Sentencing Guidelines apply to a criminal defendant who fraudulently

18   obtained contracts from his employer for companies under his control, but who provided

19   valuable services in return—that is, a criminal defendant who defrauded his employer to

20   the employer's economic benefit.  In calculating the loss resulting from Bhikha's fraud, the

21   Court concludes that the kickbacks Bhikha received from the third party company count.

22   But any loss resulting from Cisco's payments to Bhikha's own companies are offset by the

23   fair market value of the services that those companies provided to Cisco.

24   **I.    BACKGROUND**

25        Bhikha has pleaded guilty to one count of conspiracy to commit wire fraud in

26   violation of 18 U.S.C. § 1349 and one count of aiding or assisting in the preparation of a

27   false or fraudulent tax return in violation of 26 U.S.C. § 7602(2).  Bhikha's underlying

28

United States District Court
Northern District of California

1    conduct is not in dispute.[1]

2        Bhikha began working in Cisco's Global Supplier Management group in 1999.  In

3    2014, he became a senior director of the group, which obtained parts from suppliers and

4    vendors around the world.  Bhikha had long advocated for the approval of a project

5    through which Cisco would hire third-parties to negotiate with manufacturers to obtain

6    lower prices on small parts used in Cisco products.  In 2013, Cisco agreed to pursue the

7    project, named it "Project New York," and put Bhikha in charge.

8        As part of Project New York, Cisco hired "Company 1" to negotiate lower prices on

9    Cisco's behalf.  But there was a catch:  Bhikha told the president of Company 1 that

10   Company 1 would have to give Bhikha a large percentage of the fees that Cisco paid for

11   Company 1's services.  Bhikha had incorporated his own company in Hong Kong named

12   Lucena Limited.  Each time Cisco paid Company 1, someone purporting to represent

13   Lucena contacted Company 1 and sought roughly 70%-80% of Cisco's payment.

14   Company 1 generally complied with these requests and paid $1.15 million in kickbacks to

15   Lucena's bank account during 2013 and 2014.

16       Then Bhikha had a more ambitious idea:  He could hire his own company to

17   negotiate lower prices on behalf of Cisco.  Bhikha transferred control of Lucena to his wife

18   and hired a total of 24 people in India to work for Lucena.  Then he ensured that Cisco

19   hired Lucena to negotiate on Cisco's behalf.  When a Cisco finance employee raised

20   concerns about Lucena to a supervisor, Bhikha had his Lucena subordinates deceive Cisco

21   during a 2016 meeting.  One subordinate prepared a "white paper" containing false

22   information; another posed as the CEO of Lucena and told Cisco's representatives

23   (including Bhikha, who was feigning neutrality) that Lucena was part of another company

24   called InESS.  To maintain the scheme, Bhikha incorporated a company named InESS

25   Global Lucena Pte. Ltd. in Singapore, and Cisco began sending Project New York

26   payments to that company's bank account.  All told, from 2014 to 2017, Cisco paid

27

28
---
[1] The Court relies on the Plea Agreement and the Presentence Report, both of which are sealed.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   $10,060,000 to Lucena and InESS.  Bhikha and his wife transferred more than $9 million

2   to bank accounts held in their names in the United States and used some of the funds to

3   purchase two residences in San Francisco.  They did not report this income to the U.S.

4   Internal Revenue Service.

5   Bhikha did not simply use his companies to steal money from Cisco without

6   providing anything in return.  Consistent with their contractual obligations, his companies

7   negotiated lower prices on behalf of Cisco.  Indeed, Bhikha avers that Cisco realized more

8   than $69 million in profits due to Bhikha's conduct—accounting for Cisco's payments to

9   the companies and the resulting cost savings on small parts.  See Bhikha Sentencing Memo

10   (Dkt. 128) at 20.  Neither the government nor Cisco has argued or presented evidence to

11   the contrary.  See Gov Sentencing Memo (Dkt. 126); Cisco Victim Impact Statement (Dkt.

12   126-7).  Even assuming that the $69 million figure is inflated, there appears to be no

13   dispute that Bhikha's secretly-owned companies saved Cisco tens of millions of dollars.

14   In May 2017, another high-level Cisco employee first raised the idea of running

15   Project New York with in-house employees, rather than using outside firms.  See Gov

16   Sentencing Memo at 5; Bhikha Response (Dkt. 134) at 4.  Bhikha argued that it was more

17   cost-effective to continue using outside firms and claimed that he was attempting to obtain

18   lower prices from Lucena.  See Gov Sentencing Memo at 5.  In any event, just a month

19   later, Cisco terminated Bhikha's employment after discovering the scheme.

20   Bhikha has since pleaded guilty to conspiracy to commit wire fraud and aiding and

21   assisting in the preparation of a false and fraudulent tax return.

22   **II.   SENTENCING DISPUTE**

23   In their sentencing memoranda discussing how the advisory Federal Sentencing

24   Guidelines should apply to Bhikha, the parties agree about many things.  They agree that

25   the Guidelines range for Bhikha's tax offense is 36 months (the statutory maximum).

26   They agree that Bhikha's wire fraud offense level should be adjusted upward by four

27   because a substantial part of the scheme was committed abroad and the scheme involved

28   sophisticated means, see U.S.S.G. § 2B1.1(b)(1)(B), (C), and because Bhikha abused a

3

1    position of private trust in a manner that significantly facilitated the commission of the

2    offense, see U.S.S.G. § 3B1.3.  They also agree that Bhikha's wire fraud offense level

3    should be adjusted upward based on the "loss" resulting from the offense.  See U.S.S.G.

4    § 2B1.1(b).  And they agree that the $1.15 million in kickbacks that Bhikha received from

5    Company 1 should count toward this loss.

6         The parties disagree about whether the $10,060,000 that Bhikha caused Cisco to

7    pay to his secretly-owned companies should also count toward the loss calculation.  The

8    answer could significantly impact Bhikha's sentence.  If the $10,060,000 counts, the

9    applicable Guidelines range is 87 to 108 months.  If it does not count, the applicable

10   Guidelines range is 51 to 63 months.  The loss calculation also affects how much

11   restitution Bhikha owes Cisco.

## III.    DISCUSSION

13        Under § 2B1.1(b) of the Federal Sentencing Guidelines, the offense level for fraud

14   increases depending on the magnitude of the loss resulting from the fraud.  As relevant

15   here, a 20-level increase applies to fraud that results in a loss greater than $9.5 million but

16   less than $25 million.  For fraud that results in a loss of $1.15 million, only a 14-level

17   increase applies.

18        That all begs the question how to calculate "loss" in this context.  Section 2B1.1

19   Application Note 3 explains that when calculating "loss," a district court must use "the

20   greater of actual loss or intended loss."  U.S.S.G. § 2B1.1 Cmt. 3(A).  Only actual loss is

21   relevant here, and actual loss "means the reasonably foreseeable pecuniary harm that

22   resulted from the offense."  Id. Cmt. 3(A)(i).  Pecuniary harm "means harm that is

23   monetary or that otherwise is readily measurable in money."  Id. Cmt. 3(A)(iii).  Thus,

24   pecuniary harm "does not include . . . harm to reputation, or other non-economic harm."

25   Id.  Crucially, in calculating loss, courts cannot ignore economic benefits that the

26   defendant provided to the victim.  Accordingly, to arrive at a final loss calculation, the

27   pecuniary harm must be "reduced by . . . the fair market value of the . . . services rendered,

28   by the defendant or other persons acting jointly with the defendant, to the victim before the

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1   offense was detected." Id. Cmt. 3(E)(i).

2        Because they must consider net loss in the above-described manner, sentencing

3   courts must "take a realistic, economic approach to determine what losses the defendant

4   truly caused." United States v. Crandall, 525 F.3d 907, 912 (9th Cir. 2008) (quotation

5   omitted).  This reflects a commonsense understanding that a defendant who makes off with

6   all of a victim's money while providing nothing in return should receive a harsher criminal

7   punishment than a defendant who, though guilty of fraud, provides the victim with some

8   valuable service.  For example, in United States v. Martin, the defendant "fraudulently

9   obtained government contracts by misrepresenting her assets to qualify for programs

10  designed to aid disadvantaged businesses."  796 F.3d 1101, 1103 (9th Cir. 2015).  But the

11  defendant did not steal from the government without providing anything in return; she

12  "successfully performed each contract." Id. at 1104.  The Ninth Circuit held that "[b]y

13  fully performing all of the contracts," the defendant "gave the government considerable

14  value," and noted that "[i]t would be unjust to set the loss resulting from her fraud as the

15  entire value of the contracts." Id. at 1110.  Consistent with the rule that the defendant

16  should receive credit only for the "fair market value" of the services, there could still be a

17  loss if the government presented evidence that it had "paid a premium contract price above

18  what it would pay for other contracts under normal competitive bidding procedures." Id. at

19  1111.

20       Applying these principles here, Bhikha's offense resulted in a loss of $1.15 million,

21  the amount that Bhikha received in kickbacks from Company 1.  Cisco's $10,060,000 in

22  payments to Bhikha's companies are offset by the fair market value of services that Bhikha

23  and those acting jointly with him (his Lucena and InESS subordinates) provided to Cisco

24  before the offense was detected and Bhikha's scheme unraveled.

25       The Court starts with Cisco's nominal pecuniary loss. See U.S.S.G. § 2B1.1 Cmt.

26  3(A)(iii).  Cisco paid $10,060,000 to Bhikha's companies.  Any non-economic harm does

27  not count. Id.

28       The Court next considers whether Bhikha's companies rendered services in

United States District Court
Northern District of California

1    exchange for those payments.  Id. Cmt. 3(E)(i).  Bhikha's companies provided Cisco with

2    significant services by negotiating on behalf of Cisco with parts suppliers.

3            Finally, the Court considers evidence of the "fair market value" of those services,

4    because Cisco's loss must be "reduced" by that amount.  Id.  The Court concludes that the

5    fair market value of Bhikha's services at least equaled the amount that Cisco paid to

6    Bhikha's companies because those services resulted in tens of millions in profits for Cisco.

7    Indeed, neither the government nor Cisco has provided evidence suggesting that the fair

8    market value of the services was less than $10,060,000.  Even assuming that the possibility

9    of Cisco using in-house employees to negotiate cost savings is relevant to the "fair market

10   value" analysis, see Gov Sentencing Memo at 5, the evidence does not establish that Cisco

11   would have or could have performed the same work for less money by using in-house

12   employees.  The evidence indicates that Cisco chose to shift risk to outside firms and

13   considered taking Project New York in-house only a month before the scheme was

14   detected.  Id.  Cisco could not have achieved meaningful savings in that month.  Further,

15   there is scant evidence that taking Project New York in house actually would have

16   improved profits.  Depending on the year, Cisco's Project New York budget could have

17   supported six-to-twenty full time Cisco employees.  Id.  Bhikha's companies used twenty-

18   four employees and achieved massive cost savings for Cisco.  Finally, the government

19   implies that because Bhikha did not negotiate at arm's length with his own companies,

20   Cisco's payments did not reflect the market rate for the services that those companies

21   provided.  But that implication does not follow.  It is just as likely that Bhikha did not need

22   to charge above-market rates to profit individually from the scheme, and that doing so

23   would only attract unwanted attention.

24           In sum, any argument that Bhikha's companies charged more than fair market value

25   for their services is pure conjecture.  And given that those companies delivered cost

26   savings to Cisco far (very far) beyond what Cisco paid, the Court finds that the fair market

27   value for those services equaled or exceeded $10,060,000.  Bhikha is entitled to a credit

28   that at least equals Cisco's payments to his companies.  Cisco made tens of millions of

United States District Court
Northern District of California

1    dollars as a result of Bhikha's fraud; it did not somehow lose money at the same time.

2    The government has suggested several alternative approaches to calculating loss,

3    each of which fails to adhere to the Sentencing Guidelines.

4    The government's first approach would treat Bhikha no different from a fraudster

5    who absconds with a victim's money without providing any services in return.  The

6    government argues that Cisco's payments should count towards the loss amount because

7    Cisco would not have entered into contracts with Bhikha's companies if they knew that

8    Bhikha owned them.  See Gov Sentencing Memo at 8–9.  This argument would have the

9    Court stop its analysis before considering what services Bhikha provided to Cisco,

10   contrary to U.S.S.G. § 2B1.1 Cmt. 3(E).  It also ignores the economic reality that Bhikha's

11   conduct benefited Cisco, see Crandall, 525 F.3d at 912, because there is no evidence that

12   Cisco would have realized tens of millions of profits without Bhikha's fraud.  This

13   conclusion neither condones Bhikha's conduct nor shields him from liability.  Bhikha is

14   going to prison.  And, under Bhikha's employment agreement and basic agency principles,

15   Bhikha is likely civilly liable to Cisco for any profits that he earned while operating his

16   secret companies.  But that liability, which results from Bhikha's contractual breach, does

17   not control the Court's sentencing analysis under the relevant Guidelines.

18   The government's next two approaches are also flawed.  They suggest that Bhikha

19   is entitled to some credit for the services he rendered, amounting only to Bhikha or his

20   companies' actual costs.  See Gov Sentencing Memo at 10.  These approaches ignore that

21   the Guidelines focus on the "fair market value" of the services rendered.  U.S.S.G. § 2B1.1

22   Cmt. 3(E).[2]  Fair market value does not equal operating cost.  A person can both (i) sell a

23   service at fair market value and (ii) make a profit—and potentially a sizable profit—while

24   doing so.[3]

25

26   [2] For the same reasons, the Court rejects Cisco's estimates of its own losses, which do not address
     the fair market value of the services rendered.  See Cisco Victim Impact Statement at 6–8.

27   [3] If the government means to imply that Bhikha could have operated his scheme within Cisco,
     with the same costs, such that the fair market value of the operation should merely equal those

28   costs, there is no evidence that Cisco would have accepted such an arrangement.  As discussed
     above, Cisco chose to outsource the work and, to a large extent, the risk that went along with it.

1       The government's last alternative approach fares no better.  In that approach, the

2   government invokes U.S.S.G. § 2B1.1 Cmt. 3(B), which provides that sentencing courts

3   may rely on gains when there is a pecuniary loss that "reasonably cannot be determined."

4   That fallback methodology applies "only if there is a loss."  Id.  But here, the problem is

5   not that there is a difficult-to-measure loss.  The problem is that, having considered the

6   record, the Court finds that there was no loss to begin with—aside from the loss resulting

7   from the kickbacks, which is readily measurable.

8   **IV.    GUIDELINES CALCULATION**

9       Based on the above analysis, the parties' agreement regarding other provisions of

10  the Sentencing Guidelines, and the court's own analysis of those guidelines, the applicable

11  Guidelines range is 51 to 63 months.

12      The adjusted offense level for the wire fraud count is 25.  The base offense level is

13  7.  Under § 2B1.1(b)(H), a 14-level upward adjustment applies based on the $1.15 million

14  loss (i.e., the kickback loss).  An additional 2-level adjustment applies because a

15  substantial part of the scheme was committed outside the United States and the scheme

16  involved sophisticated means.  See U.S.S.G. § 2B1.1(b)(1)(B), (C).  Another 2-level

17  adjustment applies because Bhikha abused a position of private trust in a manner that

18  significantly facilitated the commission of the offense.  Id. § 3B1.3.

19      The adjusted offense level for the fraudulent tax return count is 24.  The base

20  offense level is 22 based on a tax loss of $2,525,647.80.  See id. § 2T1.1(a)(1), 2T4.1(I).

21  A 2-level adjustment applies because Bhikha's unreported income exceeded $10,000 for

22  each relevant tax year.  See id. § 2T1.1(b)(1).

23      The offenses are treated as separate groups because they did not involve the same

24  victim or harm.  Id. § 3D1.2.  The greater adjusted offense level is 25, and (based on the

25  number of units) that is increased to 27.  See id. § 3D1.4.  Subtracting 3 levels for

26  _____

27  By the time Cisco became (vaguely) interested in taking the work in-house, Bhikha's scheme was
    about to unravel anyway.  Bhikha wrongfully concealed his activities from Cisco, which may give
28  rise to liability under his employment contract and under basic agency principles.  But here, the
    Court's job is limited to determining the realistic economic loss resulting from Bhikha's fraud.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    acceptance of responsibility, the total offense level is 24.  Because Bhikha's Criminal

2    History Category is 1, the resulting Guidelines range is 51 to 63 months.

3    **V.    RESTITUTION**

4            With respect to Bhikha's violation of 26 U.S.C. § 7206(2), Bhikha must pay

5    $2,525,647.80 in restitution to the IRS.

6            With respect to Bhikha's violation of 18 U.S.C. § 1349, Bhikha must pay

7    $1,150,000 in restitution to Cisco.  "California courts have recognized that, under

8    principles of agency theory, unless otherwise agreed, an agent who makes a profit in

9    connection with transactions conducted by him on behalf of the principal is under a duty to

10   give such profit to the principal."  United States v. Gamma Tech Indus., Inc., 265 F.3d

11   917, 929 (9th Cir. 2001) (quotation omitted).  The Ninth Circuit has applied this principle

12   to restitution in criminal cases.  See id.; United States v. Gaytan, 342 F.3d 1010, 1012 (9th

13   Cir. 2003).  That said, restitution "can only include losses directly resulting from a

14   defendant's offense."  United States v. Bussell, 504 F.3d 956, 964 (9th Cir. 2007).  Here,

15   the Court has determined that Bhikha's fraud caused losses only to the extent that Bhikha

16   received kickbacks.  And the government has taken the position that the amount of

17   restitution should equal "the Guidelines loss amount determined by the Court."  Gov

18   Sentencing Memo at 14.  The Court thus declines to award Cisco any restitution based on

19   its payments to Bhikha's overseas companies, though it bears repeating that Cisco may

20   recover some or all of this money in separate civil proceedings.  That leaves the $1.15

21   million in kickbacks that Bhikha received.  Bhikha rendered no services to Cisco in

22   exchange for these payments, which are rightfully Cisco's.  See Gamma Tech Indus., 265

23   F.3d at 929 (holding that the district court properly ordered the defendant to pay restitution

24   to his former employer in the amount of kickbacks he received while acting on behalf of

25   his employer).

26   **VI.   CONCLUSION**

27           For the foregoing reasons, the Court concludes that the applicable Guidelines range

28   is 51 to 63 months and that Bhikha must pay $2,525,647.80 in restitution to the IRS and

United States District Court
Northern District of California

1  $1,150,000 in restitution to Cisco.  The Court expects to advance Bhikha's sentencing

2  hearing and to impose a sentence consistent with these conclusions.

3       **IT IS SO ORDERED.**

4       Dated: August 3, 2021



CHARLES R. BREYER
United States District Judge

10